Good afternoon, Your Honor, David Gunn for Appellant Chesapeake, and at the end of a long day, I want to start with the ending, with the prayer for relief. We're asking you to overturn the Vacature Ruling, order confirmation of the awards, and end the judicial proceedings there. That won't end the dispute between the two principal parties, there's some unfinished business left to take care of in arbitration that hasn't started, that needs to take place, that's not before the court, but it will allow you to reverse the errors that have been committed and undo the injustice that we believe has been done. And I want to persuade you today, there has been an injustice, and start with the District Arbitration Act. In particular, I would call your attention to two back-to-back sentences on page three of the opinion, because they are wrong legally and factually. Page three of the opinion, the District Court said that Mr. Long was required to disclose his relationships or circumstances that would lead a reasonable disinterested person to And then the District Court said, when he claimed that he did not have professional or social connections with the parties or witnesses, he lied. Starting with law, question is the wrong verb. It's not about questioning, you must be compelled, a reasonable third party must be compelled to conclude that the arbitrator was partial to one of the parties. That's this court's decision in Cooper, it's consistent with the law in other circuits. Questioning is not enough, and I'm not dwelling on semantics here, it actually makes a difference, it goes back all the way to Commonwealth, and the difficulty between the plurality, the concurrence, and so on. But that's the legacy of Positive Software, Cooper, and so on. What kind of undisclosed relationship with a non-party would constitute evident partiality? Directly, Your Honor, I think none. None? None. I think nondisclosure of a relationship with a non-party or non-witness will not get to evident partiality. I think evident has to be positive and clear. Nondisclosure won't get there. Under any circumstances, if it's a non-party? I think it would be very difficult. I won't say never, but I think a strong presumption that that will not be evidence of evident partiality, Your Honor. So if they're having an affair with the principal's wife, and they're not a party, but they want the person to lose all their money because they hate them, and they want the person to leave their spouse. That's not, I mean, I'm sorry, that's a weird hypo. And I understand. I could conceive of an extreme case, and I guess I'd want to pull out the 14 questions that were given here. And it's a little bit like jury selection. In our state court days, you ask the panel certain things. At the end, there might be something that wasn't asked. You asked jurors number two, four, six, and eight. Maybe number nine wasn't asked. Maybe in an extreme case, but I think as a strong presumption, nondisclosure of relationships with a non-party and non-witness should not get there. Now, I hope I've established, because that's not what the district court found, of course. District court said Mr. Long lied vis-a-vis the parties and the witnesses. I think that's demonstrably wrong. I don't believe you'll hear that contradicted today. These questions, there were 14 of them from the AAA. They're explicit. I don't think there's an argument being made that any of those answers are inaccurate. Those had been answered falsely. You have another case. I would have a problem. It's got to do with telling the whole truth? Well, I think that's... You don't tell not just the truth, but the whole truth? The whole truth can take a long time, Your Honor. And this is an industry arbitration clause where we need industry experts to be seated as the arbitrators. And so, as Justice White said in Commonwealth, as Judge Posner said in Merit, that there are going to be ties in the industry. That's a tradeoff that we get for expertise. The policy, sound policy, says that the solution to those problems is for the parties to do their vetting up front. Just ask the questions. There was no limit. People could ask more questions and say, I'm not satisfied, AAA, with the 14 questions. I have a few extras. Let's talk about more. Do all of that up front. Then you don't have to worry about the sour grapes problem of someone coming in afterwards and saying, I don't like the result, let me do a Google search or a Nexus search and find out something that I didn't know. That's the policy problem. So I would also say that in looking at the factual record, just qualitatively, this is a rather thin, limited record. We don't have a record of the arbitration. I would love to have a record of the arbitration, the transcript, so you could see what was happening. You see very high-quality decision-making in the arbitration awards. I suspect that what you would have seen is virtually no discussion of this Mr. Goh. I take it from what you've been given, the limited references to this Mr. Goh are the only ones. He was not a party, he was not a witness, and we think with this limited record, you need to take that into account. Is the chart in the district court's opinion correct in all respects? It is. I think misleading, at least, because the investments that it talked about were pre-2010, when Mr. Goh got on the plane in 2006, I think it was, and flew off to Singapore. So the scattered investments with Mr. Goh are dated. But they're real. Well, they were at one point. They're all factually, but they were in these long-term business relations where they were partners together, one was the manager, and the other was the owner, and those are all accurate, right? They are accurate in the sense that something did happen, yes. I don't mean they're not fabricated, they're not made up, but some of them were fleeting. One was 12 years, is that right? 12 years in the past? No, it lasted that long. Maybe I'm wrong on that. Help me. Well, I don't recall that. I do recall that by 2010, they're gone. And you have termination certificates for the entities, you have bankruptcy that wipes out the equity, and I think it's North American something or other. Is Mr. Trachtenberg going to talk about, or I'm trying to figure out about FTS and its relationship to this dispute. Let me start with that directly. So are you going to talk about that? Yes. FTS is the fracking vendor. And the fight about the fracking vendor is, were we, OOGC, were we overcharged? Sort of, you know, if you hire your brother or your brother-in-law, don't pass on the excess to me. And that's the way this contract is set up. The district court misunderstood that and said, is the way I read it, that FTS was charging the joint account. That's not how it works. FTS simply charges the operator, charges us, Chesapeake, we pay the bill, they go away and they're gone. They're out of the picture, and the record's undisputed on that. The question is, when we turn around to rebuild our working interest partner, can we pass on the full charges? And if they're a capital A affiliate, there's sort of a cap. You can only charge the market price, basically. That's what was litigated, and the arbitrators said, OOGC, we don't think they're an affiliate, but we'll spot you, affiliateness, if that's a word, and I'm not sure that it is. We'll spot you, affiliateness, we still don't think they exceeded, yes, we defer to Judge Whelan on this, but we'll spot you, affiliation, that's a word. We all do that quite a bit. But we don't think that you've proved, you've carried your burden of proof, plaintiff OOGC, to show overcharging, so it doesn't matter. And that's why we think FTS just has no dog in this fight. There are variations on the arguments that you see in the red brief, because they're not really defending what was found below. They've come up with some very interesting and creative alternate arguments, but a lot of their position depends on the idea that FTS cared. How would FTS know? This is a confidential arbitration. This record is largely sealed, these briefs have sealing. There's no reason FTS would ever find out. They have no incentive. When they say incentivized, I hear speculation. And the way I read positive software, we don't speculate, we want evident partiality. Okay, so can they, I should probably know this already, but are they ongoing such that if FTS is not getting reimbursed at its full rate in the past, and this didn't work out for them, they're not going to use FTS again, because there's some issue? FTS is gone, Judge O'Rourke. It's gone, okay, so there's no problem for the future? No. FTS is gone, and we won't see FTS again. Okay. FTS just rode off into this. They got paid. So they got their full money, and it's not being held up by this problem. Exactly. There's no exposure or clawback or anything like that. They just aren't affected. So, if there are no further questions, I'll yield the podium. Thank you. May it please the Court. The District Court had no basis for calling Pat Long a liar, corrupt, deceitful, and evasive, in an opinion that was quickly disseminated to over a million people. The District Court reached these conclusions about Mr. Long's mental state without him having appeared in his courtroom, and it rejected his request to intervene so that he'd have an opportunity to provide countervailing testimony and defend his reputation. Do courts do that all the time? I mean, they may not do it in such a manner, but they make determinations about credibility of witnesses or parties or other judges or lawyers, and they just put it out there in opinions all the time. I believe so-and-so. Sometimes they say, I was more persuaded by the testimony, but sometimes they say, I did not believe so-and-so, and I found them to be lying. Here we have a case, Your Honor, where there's no basis for these accusations. And so, the question is, does Mr. Long have a remedy? We know that the judge has absolutely . . . Why is there no basis? There's no basis? I mean, he has the . . . he has what happened at the AAA, right, that they've recused him or whatever, released him, and so, because there's some idea that there was a conflict for him serving. The accusations of being a liar and being corrupt and engaging in perfidy require an intent to deceive, an intent to defraud, and that's what lying is. And there's absolutely no basis in the record for the district court to have reached that finding. And Mr. Long has no ability to sue for defamation. What the district court said about him would be defamation per se under Texas law. We understand we can't bring that cause of action, but what we can do is intervene and have an opportunity to provide corrective, countervailing evidence. We know in this case that this type of injury is an actual . . . that a reputational injury is actionable in this type of . . . a reputational . . . it's very analogous to witness-lawyer, so why . . . I thought the LaCasse law is against you. Can you help me? There's very little case law, actually, about this particular topic about attorneys, in this case, trying to intervene and correct the record in this circumstance. But we do know that in Walker v. City of Mesquite, an attorney was criticized there for his litigation tactics. Even without a monetary sanction, we allow the attorneys to appeal in that case. There was a bankruptcy case where an attorney was just disqualified on the basis of a conflict. In that case, this court allowed the attorney, because of the importance of an attorney's reputational interest in particular, as agents of parties and their lifeblood as their . . . Is an attorney the only sort of non-party that has a reputational interest that we would allow to intervene? We certainly don't ask the court to go beyond that in this case, but we certainly think that in the case . . . this case presents the kind of egregious circumstances, liar, corrupt, deceit, where we think it's appropriate. But let me make one other important point, Your Honors. Even if you don't allow us to intervene, we believe this court can correct this injustice through resolution of Chesapeake's appeal, because when you go through the record . . . Through what? I'm sorry. I didn't catch that. Through resolution of Chesapeake's appeal. So even beyond all the arguments about whether we have a reputational interest or not, we believe if you go through our brief and go through the record, you will see that there are a number of misstatements, and there's absolutely no basis for a finding of intentional misconduct here. Do you think the kind of interest that would give rise to Rule 24 intervention is the same under Rule 24a and Rule 24b? There's a different language, Your Honor, under both, and certainly we recognize the abuse of . . . that your standard of review is different, but I think we satisfy the interest under both. Well, suppose they're different. Would you agree that you would have a higher threshold for intervention of right and a lower threshold for intervention . . . permissive intervention, if they're different? I'm not sure I follow. I'm sorry. So suppose they're different. I assume you would agree with me that intervention as of right would be a higher threshold to meet than permissive intervention. There are other factors in play as well with respect to intervention of right, but I think generally speaking, I would agree to that. So you would have to show at least permissive intervention, and permissive intervention requires you to come forward to show a claim or defense. And what would be the claim or defense that the arbitrator would have, the arbitrator would have? Well, and there's a large body of case law in our briefs where we talk about even parties seeking review of . . . like newspapers and other . . . outside parties seeking the right to break . . . unseal a settlement agreement or the right to access confidential documents. That's been deemed a claim or defense. I think the language you'll see in the cases we saw is very broad, and in this case, Mr. Long has a claim. It's essentially equivalent of a reputational harm injury. But who's the claim against? The claim is against, effectively, the judge in this case. He's not a party. But this is, again, this is his only pathway. Again though . . . Why is this his only pathway? Because we have a doctrine of absolute judicial immunity, so when judges say the things . . . So should you be able to manipulate that in this manner? I'm sorry? Should you be able to go around that in this manner? Well, we think we're going squarely within what Rule 24 allows, and we've cited the cases that we think get there. You mentioned . . . I'm sorry. Mind if I chime in? You mentioned the dearth of really on-point precedent in this area, and can you point to a case where intervention was allowed for a movement who conceded that he had no interest in the actual outcome of the underlying dispute? I believe in a Fifth Circuit case, let's see, Ford v. City of Huntsville is a 24A case, a mandatory case, where that was a newspaper challenging a confidentiality order that was entered in the case. Not as a party that didn't have an interest in the outcome of the litigation, but they came in under Rule 24A in that situation. And I think I would . . . Was there indication that the movement conceded that they had no interest in the outcome? Well, the movement had no interest in the outcome of the merits of the litigation. Right. Obviously, it was challenging the confidentiality of the decision or the settlement that was reached in that case. Go ahead. Are you finished answering, Judge? No. I'm . . . You're done? I am. Okay. Well, then I have a couple of questions. You just said that you . . . Did you just say that you wanted the court to vacate? No. No, we're not asking . . . We do not take a position on the outcome of the merits of the party's dispute. What we're asking . . . What did you say? What would be fixed? What we're asking for is we think that in the context of resolving Chesapeake's appeal, as you go through the allegations that Judge Hughes relied on to vacate the arbitration decision, you will see that he relied on a number of statements that were factually incorrect, and you will also see in reviewing the record that there was absolutely no basis for a finding of intentional misconduct on Mr. Long's part. And therefore, we ask, even in resolving their appeal, even with . . . Regardless, you just want us to write it differently. We think . . . That's what you want. You want us to write it and say . . . Instead of saying, we need not address whether or not he did this or not, you want us to address whether or not he did what Judge Hughes says he did. Well, we think some of those issues . . . Is that right? Those issues are in play. We think that you can correct an injustice in resolving Chesapeake's appeal. Okay. We believe we have a right. We met the intervention standards, and we believe we have . . . What do you do with Elmizian, or I may be pronouncing it wrong, E-L-M-I-Z-A-I-N, that says that unless it's an actual finding of professional misconduct, that won't be even enough for Walker or line of cases. This is not an actual finding of professional misconduct. It's affected . . . In the marketplace, it's the . . . But it's . . . In the marketplace, it's the equivalent. This has done severe harm to Mr. Long's reputation. It's disseminated to a million people, and everybody . . . Would it have done harm for him to be taken off? Was that quiet? He was already taken off by the AAA. That didn't do any harm because it's quiet and confidential or something? Correct. That gets around, too, doesn't it? Reputational injury is impacted because of the nature of how this opinion came out and how it was disseminated. No question about that. That is the very nature of a reputational injury. Okay, so you didn't have a comment on that case. You're not familiar with it. I would be happy to address it in a . . . That's okay. Is that all you have? Thank you, Your Honor. Okay. May it please the Court. Your Honor, it's Marie Yates for the Appley OOGC. Your Honor, under positive software's evident partiality test, there's a simple, clear basis to affirm the District Court's vacatur here based on two undisputed, concrete, non-speculative facts. One, Arbitrator Long failed to disclose that the year before this 2016 arbitration, he had represented alleged Chesapeake affiliate, FTS, in multiple dispute matters, including fracking litigation. He failed to disclose that. And two, the arbitration provision prohibited Long from serving as arbitrator at all if he had done material work for a Chesapeake affiliate within five years. But he spotted you the affiliate, didn't he? I'm sorry? So if he's spotting you affiliate, I thought he said affiliate means . . . so doesn't that help you? No. No, Your Honor. They're not spotting us anything. Okay. That sounded like he said, even if he said . . . No. What's going on here is that there was evident partiality in the arbitration panel's determination that FTS was not an affiliate, was not an affiliate because they . . . the panel accepted the Asian consortium theory. You know, that's companies in Hong Kong, Korea, and Singapore who are allegedly some kind of consortium. You think maybe there's a fact question there? And the panel said there's a fact question on whether FTS is an affiliate. We can't grant summary judgment. We've got to have a whole hearing on whether FTS is an affiliate because Chesapeake paid FTS hundreds of millions of dollars for fracking services. And our whole argument was we were overcharged for fracking services under the affiliate test. And counsel is correct that after they fanned against us on affiliate, then they said, well, we'll . . . you know, if they're a related party, we'll say the fees weren't excessive. But there, you see, we think the panel . . . and again, there's evident partiality here, as I will explain. We think the panel got that dead wrong because under the COPA's accounting procedures that are incorporated by the development agreements, and this is the record at page 761. It's in our brief. Under the COPA's procedures, the affiliate is supposed to charge no more than the average commercial rate. That's a mathematical determination. And what this arbitration panel said was, oh, well, forget that. We're not going to do some average. We're not going to do a mathematical calculation. We're going to adopt that if it's within a range, then that's good enough, that that's not excessive. And so when counsel tells you in his brief, oh, the arbitrator said FTS's charges were less than other . . . they're talking about two in the range, Mission and Baker Hughes, but there were lots more, you know, that would have shown that FTS's charges were excessive. And our experts did a mathematical calculation like you're supposed to under COPA's, but these evidently partial arbitrators said, we're not going to look at that. So we think that we weren't spotted anything by this . . . we were ruled . . . they ruled against us on every significant issue. Now, a positive software is a reasonable impression of biased standard. And counsel says that we, OOGC, we're speculating about Long's incentive. But, Your Honors, you, the court, have to decide what would an objective observer think? Would an objective observer think? And take his compel. It would be compelled to think. That's fine. They would be compelled to think that Long would have an incentive to want to rule that FTS was not a Chesapeake affiliate, because if FTS is a Chesapeake affiliate, Long should not have been sitting as arbitrator to begin with. Okay? Now, Long tells you in his brief, quote, he does not recall ever being aware of the prohibition in the arbitration provision. He doesn't recall being aware of it against serving as arbitrator if you'd done work for the affiliate of Chesapeake. But there's no such evidence before the district court. He didn't even put that in his sworn declaration that he filed post-judgment. And the evidence that was before the district court shows that Long did know about the arbitration prohibition, because it appears in the arbitration provision, which is in the development agreement section 14. And guess what? The arbitrators in their second award that Long signed discuss section 14 at page 10 of the second award. So he had to have known about section 14, which contains the prohibition. Okay? And then the initial disclosures of the other two arbitrators show that they knew about the prohibition. That's the record at page 829 and 851. So I don't think on this record you can accept his contention, which he's thrown out for the first time on appeal, because he wants to intervene on appeal, that he wasn't aware of the prohibition. Now, he knew he was going to be sitting to decide whether FTS was a Chesapeake affiliate. That was the crucial issue on the arbitration. In fact, Chesapeake came in and told the arbitration panel, oh, you can't even begin to think about going forward until you decide whether FTS is a Chesapeake affiliate. We had a whole hearing on that issue. And never does Long raise his hand and say, wait a minute, oh, excuse me, I've messed up. I shouldn't have been sitting here. I failed to disclose that I did all this work for FTS, that I have all these relationships that Judge Elrod referred to with their board chairman, Mr. Goh, over ten years, five different entities. Oh, that their deputy general counsel in charge of litigation, you know, she's the one that sends me work. She's my good friend. She's my former law partner. We tried lots of cases together. She went over to FTS in 2014, and by 2015, she had sent me two litigation matters. And, of course, the judicial notice facts show that in 2018, Long is lead counsel in a $100 million case for FTS. So he's got an ongoing relationship with these folks that he never disclosed, never disclosed. But FTS is not benefited. That's their argument. I'm glad you asked that, Judge Elrod. Oh, yes, they do. They absolutely have an interest. They badly want you to think that FTS doesn't have an interest. Let's talk about that. Again, concrete, non-speculative, on the face of the development agreements, if FTS is an affiliate, we get to go audit FTS, okay? We get to, we, Chesapeake has to turn over to us FTS's non-public prices that they charge third parties, and you cap any future work that FTS does for Chesapeake. You cap their rates, okay? Now, you don't have to speculate about whether FTS would have worried about that. Look at the page seven of the second arbitration award, which is in the record excerpts, which where the arbitrators, including Mr. Long, said, quote, witnesses for both parties testified that contractors are extremely reluctant in the industry to share information about rates charged to others. So you think FTS would care about whether its rates got turned over to somebody else? The arbitrators thought they would care, and a reasonable person would think, that's your objective observer, right, that any company would care about whether it got audited, about whether its rates were capped, about whether it had to disclose its financial, you know, charges to third parties. Now, counsel says, well, that was Chesapeake that had to disclose, that's not FTS. That's where you have to focus on the contractual definition of affiliate, because the contract's definition of affiliate is the power to control the management decisions by stock ownership or otherwise, or otherwise. Unbelievably to me, when they quoted it for you in their brief, they cut off the quote and left out the or otherwise. Now, what's the otherwise here? The otherwise is not only does Chesapeake own 30% of FTS and two senior Chesapeake officials sit on FTS's board, FTS is getting hundreds of millions of dollars in business from Chesapeake, okay, and Chesapeake is filing papers in its public filings and saying that FTS is an affiliate. This is why there was a fact issue on whether FTS was an affiliate under the contractual definition, okay? So, FTS did have an interest, they would have cared, and he had all these undisclosed relationships with FTS, with Mr. Goh, and Judge Elrod asked, are those true? They're absolutely true. We set out in our brief all the evidence. How about the 2016 website picture, right? 2016, that's the year of the arbitration. Here is Mr. Goh standing right next to Mr. Long, and he didn't tell us any of this. And so, yes, it's a stern standard. I get it. Positive software, we get it, that it's a stern standard, it has to be practically applied, but my goodness, isn't there a limit? Isn't there a limit? Arbitrators in this case were supposed to be neutral. That was the contractual requirement. Neutral decision makers can't sit to decide an issue on which they have an interest, and he had an interest because if they found that FTS was an affiliate, he shouldn't have been sitting in the first place. That's why he had an interest. So there's evident partiality under positive software because of all the extensive relationships that Judge Hughes set out in his opinion. And by the way, Judge Hughes pointed out that Long had done undisclosed legal work for FTS. He pointed out Long's relationship with Ms. Keefe. He pointed out all that. And then counsel tells you, as they said in their first brief, but not so much in their reply brief, counsel says, oh, you know, an undisclosed relationship with a non-party, that just can't get there. Just can't get there. In his first brief, he said, quote, failure to disclose connections to non-parties does not bear on evident partiality. That's page 27 of his first brief. But the Second Circuit, the Eighth Circuit, the Ninth Circuit, and the Eleventh Circuit all say, as we cite in our brief, oh, yeah, if it's an undisclosed relationship with a non-party and it causes the arbitrator to have an incentive to rule for the party, that gets to evident partiality. And you see, Your Honors, that's the connection to the party. Okay? They continuously beat up on Judge Hughes for saying arbitrator Long had connections to the parties and the witnesses. Well, if you read Judge Hughes' whole opinion, what he obviously means is all these for Chesapeake here. Because why? Because it made Long want to rule for Chesapeake that FTS was not a Chesapeake affiliate. Because, again, if FTS was a Chesapeake affiliate, Long shouldn't have been sitting as arbitrator in the first place. And that's why, in addition to the evident partiality under positive software, that's why we also cited, Your Honors, to the Second Circuit PETA's case. The PETA case, right? Now, that's a rarely litigated situation. That's what the Second Circuit says in PETA, where an arbitrator who's supposed to be neutral, okay? Now, this is evident partiality, but it's not nondisclosure. Because, you remember, positive software turns on the arbitrator's failure to disclose. PETA doesn't have anything to do with failure to disclose. The arbitrator's supposed to be neutral, but he sits to decide an issue that will determine whether he can be an arbitrator at all. And he has a personal financial interest in being an arbitrator. And the Second Circuit says, that's it. You can't do that. Everybody knows a neutral decision-maker cannot sit to decide an issue on which he has a personal interest. And when Long sat as arbitrator to decide whether FTS was a Chesapeake affiliate, the objective observer, who knows about the arbitration provision prohibition, Long's trying to convince you he didn't. But the objective observer is going to think, I believe, Long had an interest, okay? And does he have a personal financial interest in being an arbitrator? Let's talk about that. This is a multi-hearing, big dollar arbitration. There are big arbitrator fees here. But I think the more important interest for Long, because he's in here telling you how important his reputation is to him. I get it, right? What is he really worried about? His reputation in the arbitration community, because he wants to be able to sit on other arbitrations. He tells you in his brief of appellant at page 19, he's a frequent arbitrator. So, he's worried about that. So, let's say he got into this. Maybe he missed the arbitration provision to begin with, right? He gets into this. Can he afford to raise his hand at any point and say, ooh, I messed up. I know we parties have spent all this money, we've spent all this time, but I should have told y'all. No, because he's protecting his arbitration position so he can go sit on arbitrations. So, he didn't have to admit that he's somebody who wasn't careful enough to read the arbitration provision and know about the prohibition. So, he should have known what he needed to disclose. So, he has the financial interest in sitting in other arbitrations and he has another personal financial interest because he's got this relationship with his former partner, Jennifer Heath, who's sending him legal work, right? She goes over there in 2014. She starts sending him the work in 2015. She's still sending him the work in 2018. So, he has three different personal financial interests. So, we think it's PETA. Now, counsel says PETA's old. Well, I'll tell you why it's old. It's old because most neutral decision makers know they can't sit to decide an issue in which they have a personal interest. That's why it's rarely litigated, right? Second, they say, well, wait a minute. Arbitrators get to sit to decide whether an issue is arbitrable and they get paid to be arbitrators and so, Marie, you can't be right because they get to do that. The reason they get to do that and the only time they get to do that is if the contract permits them to because arbitration is a creature of contract. If the contract, by adopting the AAA rules or otherwise, permits them to decide the arbitrability issue, then they get to do that, right? What does our contract say? Our contract says all arbitrators must be neutral and a neutral decision maker cannot sit to decide an issue in which he has a personal interest. Now, look, there are some arbitration provisions that allow the arbitrator not to be neutral. They have party arbitrators that are advocating, you know, one side's position and in that instance, they can sit and decide an issue in which they have a personal interest but not where the contract says the arbitrators have to be neutral. For your position, does it matter when he discovered the language? No, it doesn't make any difference. What would the objective observer think? What would the objective observer think? This is a highly professional, you know, it's all this stuff about how wonderful a lawyer and arbitrator he is, right? He shouldn't have missed it and if he did miss it, he could have disclosed it later. You know, there's that point during the arbitration when the chairman, Mr. Schultz, says, I think everybody needs to go home tonight and think if there's anything else they need to disclose. He said that, right? I don't know what he was thinking. Mr. Long comes in the next day and says, I forgot to tell you all, I represented H&P. It wasn't even disputed whether H&P was an affiliate but he doesn't come in and say, I forgot to tell you, I represented FTS and I've got all these other relationships with FTS. He tells us none of that. Now, his excuse for that, he says, well, H&P was going to be a witness and you weren't going to be a witness. I don't think the objective observer could accept that and that's why we believe it's evident partiality. The simple, clear basis, just because of the prohibition and the arbitration provision and the work he had done for FTS, the relationship, the extensive relationship with FTS, which is laid out in our brief, and the PETA, the separate PETA kind of argument, all for evident partiality, right? But there's a whole other basis and a whole other reason why we should win. And that's why I was so interested to hear Your Honors ask questions earlier about, well, this was in your reply brief. I don't see it in your brief of appellant. When we argue 10A4, FAA 10A4, that's the arbitrator exceeds his authority under this court's pool raid decision because he was not selected in accordance with the contractual requirements. And what do the contractual requirements say here? You only select neutral arbitrators, right? So, and recognize that he didn't disclose everything. The AAA had to pull it out of him. They asked him five times. That's why Judge Hughes thought he was evasive and called him a liar, right? And finally, he discloses the work he did for Jennifer Keith and that very day, that's record 206, we come in and immediately file a second notice of more supplemental evidence of evident partiality and we lay out, oh, my goodness, now he's admitted that he did legal work for FTS. And there's a prohibition in the arbitration provision. He's obviously evidently partial, right? Okay. So then, before the district court, we move for an injunction because we want the rest of the arbitration to stop while the district court's looking at this. And when we move for the injunction, we say, these arbitrators long was not selected in accordance with the contract requirements. And goodness, that's section 10A4 of the FAA. So you should vacate him for that, you know, vacate the arbitration awards for that. They respond to the motion. They respond to the argument. Judge Hittner grants the injunction, but then they get to their Fifth Circuit brief and lo and behold, there's not a peep in their brief of appellant about 10A4. Then they come in their reply brief and they want to make, oh, these 10A4 arguments. I'm saying, wait a minute, you didn't do any of this in your brief of appellant under Tiwari and under the Dixon case. You don't get to do that in the Fifth Circuit. So I think he's got a big problem with that. His big 10A4 argument is we weren't timely. We weren't timely on 10A4 because we weren't within 90 days. Now, nobody disputes that we filed a motion to vacate within 90 days, right? And he says there's no relation back in the Fifth Circuit for motions to vacate because they're not pleadings. And I say, wait a minute. The way you institute a vacatur proceeding, the pleading you file is the motion to vacate. Of course it's a pleading. And of course relation back should apply. But this circuit has not addressed that. The Fourth and the Eleventh have both said relation back applies to motions to vacate. This circuit has not addressed it. But you shouldn't have to address it in this case because they waived it. They only argued that in their reply brief. It's not even in their brief of appellant. So it shouldn't even need to be addressed here. And that is yet another reason. So, see, you vacate under the clear and simple way because of the prohibition in the arbitration provision. You vacate because of all his connections to FTS. You vacate because of PETA. Those are three evident partialities. And then finally you vacate under 10A4. Now, I get that Judge Hughes only addressed evident partiality. And I know he didn't cite positive software. But he certainly applied the standard, okay? But this circuit can affirm on any basis that is valid in the record. And 10A4 is another basis that would be valid in this record. On any of these arguments, are we going to have any issue with other circuits that we're going to be creating any kind of splits? No, I don't believe, Your Honor. Not on any of these issues. Not on any of these issues. There's not a circuit court opinion that's contrary to saying that with all these relationships with this non-party FTS, when the central issue in the arbitration is FTS and affiliate, where there's a prohibition. But, you know, he relies most heavily on ANR, which is the Fourth Circuit case. But in ANR, the arbitrator's law firm had done work for the non-party. But there was no prohibition in ANR in the arbitration provision against doing work, the arbitrator doing work for the non-party. Here we have a prohibition. You see, that's the important thing. The arbitration provision treats an affiliate on the same par with the party, right? I think we have your argument. Thank you. Your Honor, you did not hear any disagreement with the assertion I made earlier about confidentiality. It means this never gets to FTS. So all of the, I say it's speculation about how FTS would have reacted, seems to me FTS is out of the picture. They don't know. It doesn't matter to them. They do not have a stake. We did hear an argument that this arbitrator should not have been sitting in the first place. That has two problems. Number one, we disagree very strongly based on this somewhat limited record that there is any proof whatsoever, no matter who the decider is, this is not an affiliate. Affiliate is defined in terms of control. A minority position on a multi-member board is not control. Control is a majority or wholly owned subsidiary, as you see in the energy business all the time. You see Exxon or BP, the big one, and then offshore, onshore, exploration, production, and so on. Those would be affiliates. And there are such entities. There are such Chesapeake entities. There are such CNOOC or OOGC entities. That's not what we're talking about. And the arbitrators actually spoke to this in one of the orders saying, you could go, OOGC, you could go subpoena third parties if you wanted other documents. That's the way you would treat someone like FTS here. We can't force them. We, Chesapeake, cannot force FTS to turn over their private books to succumb to audit rights and so on. All of those audit and third party disclosure rights presuppose affiliation. They presuppose we have control, that we can make it happen. They don't have a record. They have one fact that you have evidence of, a minority position on the board. As a matter of law, that is not control. So that's reason one that we disagree about, shouldn't have been sitting in the first place. The second reason is, that's not evident partiality. That's about qualifications. That's the kind of thing that can be vetted and should be vetted up front. They could have raised it. They even told you, hey we had all these disclosures and two of the three arbitrators talked about 14.5 and Mr. Long didn't. They saw that as well as we did up front. We had never, we, Chesapeake, had never hired Mr. Long. He had sued us once. He'd been adverse. We had no connection, no knowledge of his background. The district court says we're just as culpable. We didn't know. These disclosures were there. We were contented to go forward. They were contented to go forward on the basis of the disclosures that they now say, oh, he didn't mention 14.5. Well, they could just ask. I'm confused. Perhaps I'm perpetually confused. But why, the fact that another decision maker could say that they're not an affiliate, how is that relevant if one of the issues is to decide if they're having a hearing about whether they're an affiliate? At that point, it's relevant whether he has a relationship with them. If I misspoke, I apologize. What I was trying to say, Your Honor, was no decision maker could find affiliate status if you just have a minority position. Right, but that's, that's not the question, though. It's not whether or not they made a correct decision in the absence of if there was a conflict or not. That's not the issue before us. Right, it's just, I think an issue would be is it a triable issue of fact? And you don't have a record to show that it is a triable issue of fact. But the only thing that matters is whether or not the arbitration concerned whether FTS was an affiliate. If that was part of the arbitration, and they have a relationship, and that's, you know, that's with the entity that's subject matter of the arbitration, even if they're not a party to it, why isn't that a conflict at that point? If there's a conflict in the evidence, I think it would be, yes. And our second argument there, which we've made, is that the arbitrator spotted them, the pricing. But did they? We just heard about that they didn't use all the averages. Do you want to respond to that? I'll give you a minute to respond to that. I don't see that in this limited record. Maybe if we had the testimony we could see that, but I don't see that. So we think if you read it, it is not true that the arbitrators ruled against them on every significant issue. These were measured. There were rulings for both sides, back and forth. And I think it speaks well. We looked, Your Honor, for cases since Positive Software to see if any finding of evident partiality had been affirmed. Since that decision, we have not found one, and we ask you not to make us the one. Thank you. Oh, you have more, too. I'm sorry. I wasn't trying to cut you off in any way. Just need one minute. And I just want to make the point, Your Honor, that in order to find that Mr. Long was a liar, deceitful, or corrupt, we have to have some kind of evidence that he was alerted to this provision and disregarded it intentionally. And there's absolutely no evidence in the record to that effect. The 14 questions that were posed to him are in ROA 841 to 845. The AAA doesn't tell him in any of the communications why he is disqualified. Judge Hughes doesn't even cite section 14.5 in his opinion. So when Mr. Long comes to this case two years later and reads the district court's opinion, there's no reference to 14.5. Their motion to vacate is under seal. He's doing his best to try to answer timely under Rule 24 standards and put his affidavit in the record. But again, there's no evidence that he intentionally disregarded a disclosure requirement here. There's absolutely no basis for the district court to weep to the conclusion that he's a liar or corrupt or deceitful. When does the disregard have to have taken place? At the very beginning or after it becomes clear that FTS is going to be talked about? Arbitrators do have a continuing obligation, but the dispute resolution provision, section 14.5, wasn't part of the party's dispute. So yes, the contract was in the record, but he had no reason to call his attention to that particular language in the dispute resolution provision. But once he's sitting there and they're talking about a company that he knows a lot about... He explained his mindset in his declaration, Your Honor, that he viewed this company as... His mindset was focusing on the parties, on who the witnesses were. He viewed FTS as not having any financial stake in the arbitration. They're not a party to the arbitration. And ultimately... Did they have a whole day about this? Or is that not true? There was a hearing that was focused on FTS's affiliate status. And that was a subject matter of a particular hearing? It was a subject matter of part of at least one of the hearings. I believe. Thank you. Thank you, Your Honor. I believe we have your arguments.